Both of you, the first case this morning is case number 416-0184, People v. Daria B. For the appellant, we have Kelly Schultz. Is that the correct pronunciation? Thank you. And Mr. David Manchin for the appellee, please proceed. May it please the court? Counsel? I'm Kelly Schultz from the Guardianship and Advocacy Commission, and I represent Daria B. in this matter, the respondent appellant. And Daria respectfully asks this court to reverse the Sangamon County Court's order of January 8, 2016, ordering her to take involuntary psychotropic medication against her will. And the request from Daria is based on errors in the court below, including the failure to use a substituted judgment standard, even though there was clear evidence of her belief system and admission by the testifying doctor that she would have made the same decision to refuse medication prior to his determination of her incompetency. And the failure of the circuit court to allow her to practice her faith and rely on prayer to heal any of the problems she was having at the time, in violation of 102B of the Mental Health and Developmental Disabilities Code. And the failure of the state to provide notice of the petition adhering to her guardian, although both the court, or the state, was aware that she had a guardian at the time. And the failure of the state to prove, by clear and convincing evidence, the elements of 107.1 of the Mental Health and Developmental Disabilities Code, including the failure to prove that she even had a mental illness, by clear and convincing evidence, and even if she had a mental illness, that the mental illness was the cause of her problems that she was having that the doctor attributed to her mental illness. Can you tell me how you know the state knew she had a guardian? The hospital was aware she had a guardian. And the hospital was the state's, or the doctor was the state's witness. And it was not in the petition. And the doctor mentioned the guardian in his testimony, but prior to that, the guardian is not mentioned in the petition, is the guardian? The guardian was not in the petition, and the hospital knew there was a guardian. It was not in the petition that the hospital filled out, and the state's witness knew there was a guardian. So to that end, there was no notice to this guardian. They also failed to prove that the actions that were complained of, or attributed to mental illness, weren't due to the fact that she was going through a very acrimonious divorce. Her husband was trying to take her children away from her. She was found unfit and thrown into a mental institution. And all these things were going on in her life at the time that the doctor and then the judge agreed was caused by her mental illness. And in order for involuntary medication, the deterioration and the problems that are complained of with Daria had to have been due to her mental illness. And the clear and convincing standard is very high, as you know. And in this record, with all this other going on around her, there was really no way to know by clear and convincing evidence what was causing her emotional outbursts. And it could have just as easily been attributed to the divorce, the fact that she had an order of protection against her. When two others had been denied. So they could not prove their case to the standard that was required for this. And as you know, medication, to force something, anything, into somebody's body is huge. It's a huge assault on their liberty. And it's important that all the rules are followed. It's important that the court makes the right decision in these cases. Didn't she make statements to the doctor that she was being abused in a supernatural warfare of some sort? She did. And that goes to the religious portion of her argument. She was essentially an evangelical Christian from early childhood. And those comments, word choice, are not unusual for somebody who believes in a liberal interpretation of the Bible, because those types of themes are in the Bible. Now you say that word choice is not unusual. How would you know that? I would know that from the sightings from the Bible, that the things that are in the Bible, and the things that Daria speaks about, that it is biblical. And those are the things that she said that seemed to really trip up the doctor, and tripped up the judge, because that was witch-crafting especially. But these are how she was describing what she believed was going on in her life, including the fact that this church that they both had gone to, she and her husband, she believed that those people wanted this divorce between her husband and her. And there was nothing that the doctor, he could not disprove any of it. Her statements on that were undisputed about any interference by the church members. They also failed to prove that she lacked capacity. Daria didn't agree that she had a mental illness. Most people that we see don't think they have a mental illness. Many don't. And frankly, some folks have had many diagnoses over the years, and why should they believe one over the other? In this case, this was the first time she'd been diagnosed with a mental illness. The fitness evaluation by the court was the first time anybody said that she had a mental illness, that she had delusional disorder. And then Dr. Patabandala at McFarland agreed. So she did not have a long history. And the doctor was basing his diagnosis on her religious preoccupation, and the words that she was using, the fact that she could not rationally explain these things to him. And I think it's evident in the record, we weren't saying that the doctor has to have gone through or understood everything that the folks that he's treating are going through. He doesn't have to be of the same religious background. But he should be able to understand that that's her experience. That's her religious experience. It is biblical. And he didn't do that. He just picked out some themes, said she doesn't understand, she doesn't think she's mentally ill, therefore she has no capacity. But he did admit that she understood about the medication. He talked to her about it. He said she understood. He wanted her to take it and could understand the risks and benefits. However, I think the court agreed that if she doesn't think she has a mental illness, how can she see the benefit that he wants to give her? She believed that prayer would give her the same result that the doctor was trying to get from the medication. And under Section 102, she should have been able to use that to get the same result. Especially when the doctor said that the medications essentially are not going to make the religious beliefs, which are her long-held religious beliefs that form the base of her delusional disorder diagnosis, that those things were not going to really change very much. He was hoping that she would, essentially that her behavior would conform. That she would be able to essentially be quiet and comply. And do what she's supposed to do and that everything would be okay. But she was railing against the things that were happening to her. She was represented by counsel. She was. So she had the ability to call witnesses. Yes. Could have called witnesses from her church to testify about their religious precepts and that type of thing. Did they produce any witnesses like that? No. They also failed to prove, and as kind of stated previously, that the benefits of the meds would outweigh the risks. These meds are very dangerous. Doctors tend to like to downplay how dangerous they are. Because they don't always see horrible side effects. But those horrible side effects are there. And with Daria, she had not been on psychotropic medication before. When she was previously hospitalized, a couple years before the divorce, she was in Swedish American Hospital voluntarily. And she didn't want to take meds there. No one took her to court to get meds. I thought you said this was her first experience with mental illness. It was her first diagnosis that was in this record. She had checked herself into Swedish American. There's nothing on the record to show what the diagnosis, if any, there was. She claimed that it was something that her husband had wanted her to do. And we don't know what his motives were for that. But she then checked herself out and she did not want to take meds. And there's no indication on this record that she was ever deemed incompetent. The doctor there let her go and didn't prescribe or make her take medication and did not take her to court. So this capacity thing was, essentially, as soon as she gets to McFarland, the doctor, because she doesn't believe she has a mental illness and therefore has no insight, she must be incompetent to make that decision. And competency is kind of a threshold. If she's competent, even if mentally ill, she should be able to make her own decisions about what substances are put in her body. It's huge. But they had to medicate her, too, twice, didn't they, on an emergency basis? They gave her medication twice because she was upset on phone restrictions and she would get loud. And whether or not, and there's no evidence in this record that she ever physically harmed anybody or tried to get physical with anybody. So whether that was a proper use of emergency medicine, frankly, is unknown. But she was given medication twice. The phone restrictions on her kept her not only from calling people that she was trying to desperately get help from in this whole divorce-child-custody thing, but it stopped her from calling her children. Wasn't she calling the sheriff multiple times? She was trying to call the sheriff. She believed that he would be able to help her. She thought that the court in the divorce and the OP issues had made a mistake, that they weren't listening to her. How many times did she call him? I don't know. That's not on the record. I thought it was around 30. I thought I saw something to that effect that it was around 30 times. I didn't remember it being there, but it could very well be. And finally, the sheriff had to ask that she be restricted from calling him. And there were other people who asked to be restricted, too. Isn't that true? Yes. But was that because of a delusional disorder? Or was that because she's locked away from her kids? People are making decisions about her life. She's being financially ruined by her husband. Or is it because she has delusional disorder? And that's not clear. And if it's not clear, if it could go either way, why she's doing this, then that shouldn't go to her mental illness, those actions. What about the mootness issue? This case, obviously she's out. She's not in McFarland anymore, so it's moot. But it meets the exceptions of public interest and capable of repetition. The issues here that, on the public interest are, what role does, can religion, long-held religious beliefs, be a part of diagnosis of mental illness? And that's important. And that's important for the substituted judgment issue. It's important on the 102 issue. And there's not a lot of law, if any, out there on the role between someone's long-held religious beliefs and what the court and doctors and involuntary situations can do to those people. The state points out that NRACE directly addresses that issue, so that would not make it fall under the public interest exception. What do you say to that? Well, NRACE, essentially on the substituted judgment issue, NRACE seems to, the court was saying that it's most important about, you know, these are very important liberty interests. Psychotropic meds are dangerous. And that we want to find out what this person would want. That's why the Mental Health and Developmental Disabilities Code allows a mental health declaration to determine what someone wants. That's why a power of attorney for health care can go ahead and make decisions for someone, even if the person is incompetent. And the court seemed to follow that line of reasoning that on the substituted judgment issue, that, you know, what standard should a court use? Why shouldn't they be more likely to use a substituted judgment standard than a best interest? And it seems from the cases I read that the substituted judgment is like, well, the court didn't say you have to use it. But NRACE was pretty clear that if there's no evidence to prove what that person would have done when competent, then you go to the best interest. But we always want the person's self-determination. NRACE, the court was talking about how important voluntary treatment is. That if someone's, you know, acquiescing, wanting the treatment, it's much better than the court to drag them kicking and screaming to get IMs because they're not wanting to take any sort of medication. And there needs to be determination about is that a hierarchy? Should the courts look at that first? And NRACE seemed to suggest that they should, but the cases I've seen don't seem to do that. And I think that it's important to get that determination on what the circuit courts should do in these kind of cases. Well, and as to substituted judgment, it would seem that one of the prerequisites to that is that there be a previously expressed statement or communicated statement as to what the individual would want to have happen under those circumstances. And here, is there evidence of that? Yes. And NRACE, I don't believe, makes it some sort of written declaration. The court has said that intent for treatment, what the person would intend is in Daria's case, which is what we're arguing, can be found in the knowledge of the person's value system. So this whole case was about her value systems, what she would have done. And the doctor here admitted she would have refused them anyway. So there was evidence, clear evidence of her intent, even if the court were to agree with the doctor that she was incompetent at the time of the hearing or at the time she came to McFarland. Also, it's public interest that there be some sort of determination on Section 102, which seems to suggest that unless you're in some sort of religion that has a practitioner, certified practitioner, that will pray over the person or use some sort of healing, that 102 wouldn't apply. NRACE didn't seem to go that far, but the statute itself would seem to express that. And in that case, you'd have religions like Scientology that don't believe in psychiatry and would have their own way to heal alleged mental illness. If someone was a Native American and everybody hears shamans, but a lot of Christian denominations don't have those kind of practitioners. And certainly there's no evidence that Daria's did. Daria believed that a person could be healed by prayer, by her intervention of the Holy Spirit. And so does 102 not protect those people? And that's something that needs some determination as well. Council cited several cases about the guardian notification issue. And just aside, those were admission cases, and there seems to be a little different standard on those, whether something is harmless error on admission case versus a medication case. For example, in the matter of Robinson, the medication portion of that case was reversed. And there's ample law about strict compliance, especially on the treatment on medication issues. Who was her guardian? Her guardian was a public guardian. It was Scott, and I cannot recall his last name. From her home county? Yes, from her home county. And she had an attorney also that she was working with, but she did have that guardian. In closing, the doctor just thought she wasn't acting rationally or reasonably. She wasn't reasonable the way she was acting. Daria should have been given the benefit of the doubt. Daria should have been able to affect her mental care, her emotional care. She said she was grieving from being away from her children for a lengthy period of time, and she was frustrated at every turn. And to just attribute everything she's doing to mental illness, I think, did her a disservice. And she just wanted justice, and we would ask that this petition, this order, be reversed. Okay, thank you. We'll have rebuttal. Mr. Manchin. Good morning, lawyers. May it please the court, counsel. This case is clearly moot. This is not a substituted judgment issue that counsel says needs to be cleared up. It has been discussed numerous times, starting with CE and in a number of other cases, so that the law as to how the substituted judgment is to be applied is perfectly clear. There's no need for guidance to the courts to say this is what should be done or whether you should consider it or not. The trial court here expressly referred to CE and its findings regarding substituted judgment and applied this test established in CE, which was that if you know what the defendant, excuse me, the respondent's beliefs are, what they would do when there's no doubt about their capacity, you can take that into account. But if you don't know that, you go with the best interest. In this case, there was no evidence of what respondents' beliefs regarding healing or faith or prayer being a cure, that if there's no doubt about her competence, she refused medication. The doctor said that she never told him that she was refusing medication based upon her religious beliefs or her belief in prayer. What about counsel's suggestion that it doesn't have to just be a previously expressed belief, clearly communicated prior to whatever event has precipitated the admission, but it can be discerned from the value system of the respondent? How would that work? In this case, how would the court make that determination? Well, the only evidence we have presented of her background is her own testimony as to what she believed. There was no evidence regarding the church she belonged to, what principles it taught, what it thought about prayer or medicine for healing. There's no testimony about how religious she was before she was admitted. So the only thing we have is her testimony, and her testimony shows that she is not in touch with reality. This whole business about a conspiracy for the end times by the entire church, by three women in particular, by her attorney, by the state's attorney, by the judge, by everybody in the world, shows that this lady is not in touch with reality and supports the trial judge, the expert's opinion that she suffered from a delusional disorder. This diagnosis was the same one that had been made four months earlier when she was found unfit to stand trial because she was unable to understand the proceedings or to assist her attorneys. The request for medication was made after four months, not immediately, but after four months of treatment where she was not improving in any shape or form, but was in fact deteriorating, so that this was not a rush to judgment or rush to shove drugs into this woman to try to get her to behave herself. The doctor believed, as far as the cost-benefit analysis that counts as challenges, the doctor said that, no, this is not going to be a complete cure, but that is not the standard for administration of medications. It is, do the benefits of this medication outweigh the deficits of the problem? In this case, the expert testified that this drug would allow a respondent to make a rational decision to rationally view her situation, to be able to talk rationally with her attorneys to resolve these outstanding issues that were being exacerbated by her conduct, where she was writing letters to the court, making repeated phone calls to everybody, making outrageous claims to the police department that they're supposed to investigate some sort of crime when there's absolutely no evidence of any crime, which is what led to the restriction on calls to the police department, the restrictions on calls to the members of her family, to her attorney. All were reasonable ones, given the sheer volume of the calls, the nature of the calls, and the constance of the calls. Respondent says that this is just simply a lady who is super, in a nutshell, the argument is this lady is super religious and her religious beliefs are being held against her. The doctor testified that his diagnosis was not based solely upon her statements regarding her religious beliefs, but was based upon everything, her conduct in the unit, upon the prior diagnosis, her response to treatment. So this is not just simply saying, okay, anybody who believes in angels and demons and witches is nuts. Because there's a difference between a belief in the Bible and a belief in angels and a belief in demons and the type of beliefs that respondent has regarding an actual curse upon them that has caused this or this overwhelming conspiracy of everybody to break up her marriage and the like. What about the fact that there was no notice provided to the guardian? That is problematical, but I think it has been waived because there was no objection below and there's no showing of any prejudice to the respondent based upon the lack of notice to the thing. We don't know what, on this record, I don't believe the record showed what kind of guardian it was, whether it was a financial guardian, whether it was a guardian of the person, whether it was a guardian created because of her mental state or what it was, or it was a guardian that was appointed in respect with this finding of her fitness. So we don't know anything about the guardian or how much she could have added to these proceedings if you'd been provided notice. She was represented by counsel and counsel did not object to the lack of notice to the guardian. That's correct. With respect to the substitute adjustment test, in my brief, I set out in detail the trial court's findings. It's on Volume 3, pages 13 and 15, where the trial court refers to CE and then applies the CE test and says, look, there's nothing here showing what she would have done if competent. And that's true, there was nothing. The whole case, as far as smoothness, this whole case really boils down to an argument regarding the sufficiency of the evidence to order the medication. It has a somewhat different twist in that you have the religious beliefs thrown in, but this is not the first time people have had religious beliefs that have impinged upon or been involved in any kind of diagnosis. Like I said, there is a difference between believing in the Bible and believing that three ladies in the church have put a curse on you and you're acting in your life based upon that curse that's been placed on you by somebody else. The trial court here was presented with testimony from the experts who testified that she had a delusional disorder which was a recognized psychiatric condition. This was the same diagnosis that had been made four months earlier in the finding of unfitness. The very fact that she's unfit to stand trial is certainly evidence of her lack of capacity, her lack of ability to make a rational decision regarding whether or not to accept the medication. Her own testimony, like I said, just showed that she was completely out of touch with reality. And that sort of delusions, the expert believed that the respondent would be able to better deal with her delusions, with her beliefs with this medication, would be able to then assist her attorneys and to solve this ongoing problem, which is what the respondent was supposedly reacting to. The fact that this is the first diagnosis of a mental disorder does not preclude the order of medication. If you have to have a previous history of diagnosis, there will never be a person ever admitted to the hospital who ordered to take medication because when they're brought in the first time, there will never have been that first diagnosis to look at. This reference to the Swedish hospital three years ago does not say anything about her capacity at this particular time, three years later, when she's unfit for trial, where she's making no progress in treatment, and where the doctor says that she has a delusional disorder that will be helped by the medication. And the trial court decision was not contrary to the manifest way to the evidence in this particular case. The trial judges made a very careful review of all the evidence, and based upon the expert's opinion that ordered the medication, that decision was correct. With respect to the question of the statute saying that allowing only certain religious groups to be able to create as an exception to the medical treatment, 107, there is a rational basis for distinguishing between a group that has the treatments, counselors, and somebody off the street who claims a religious basis for their refusal of medication. The purpose of the statute is to provide treatments for the person to try to help the person deal with their problems. The counselors provided for the statute are provided an alternative means of treatments that is simply not there if the person is just saying, I'm going to secure myself through prayer. So I think that the distinction drawn in the statute is reasonable, and does not violate the Respondents for Freedom of Religion, a claim that was never raised below, and never fully developed on appeal as far as why the legislature can't distinguish between the two sets of individuals. If there are no further questions from the court? I don't see any. Thank you. Is there any rebuttal? Yes, thank you. On the waiver issue, in the matter of Robinson specifically said that the failure to object in medication proceedings does not amount to waiver. That's again the court's higher, seemingly a higher standard on the medication issues than some of the admission issues. In fact, on admission there are things that can't be held to a harmless error analysis even. So if a person is kept an hour later than the 24 hours without a cert, they shall be released forthwith. But other things on admission cases are more amenable to a harmless error analysis. But this is a medication case, and the notice to her guardian was not given, even though the state's witness knew there was a guardian. On the expert opinion, this court is, as is the trial court, is free to ignore any expert opinion that is not based in fact. Just because a person is an expert, the court does not have to accept And in this case, Daria's diagnosis does not have a factual basis to the extent that it's clear and convincing that that's what was going on, or that's what was causing her behaviors. Counsel suggested that she was out of touch with reality, and that she has no capacity. Really, in this case, the only element from In Re Israel about capacity that would go against Daria was the unfitness, was the fact that she was involuntary. She understood why she was there. She understood the legal system. She didn't like what was happening to her. But there's nothing in this record that says she doesn't understand she's going through this divorce. She has an OP. These things that are done to her, she's saying they were done unlawfully. And that's where the crime comes in, where counsel says that it's part of her rational behavior that she complains about there being crimes. And that's why she was calling the sheriff. She believed that the not disputed by the doctor that anything that was said in that court might have been perjury. It was interesting in her testimony, and it's in the transcript, that the people at this church, the Kingdom Sending Center, that she believed would benefit from her divorce. And again, whether that's reality or not, it's well known that when there are divorces, people take sides. And her attributing something to a curse, I don't know that she said that those three people at Kingdom Sending Center placed a curse. She said she believes what was going on with her was part of a curse. But in her testimony, she also was not blaming the woman that was currently living with her was attempting to get my marriage to fall apart. And that, I thought, was very telling, that she could differentiate between those two things. And again, it's only her testimony that we know. And so there was nothing that the state put out for the court to show that anything she said was not true. Everything she said was based on her biblical testimony. And she was essentially a crusader. And she wanted those things to be fair, and it was not fair what was happening to her. And the state did not prove their case, certainly not by